UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

T.S.,

Plaintiff,

v.

SSA COMMISSIONER,

Defendant.

Case No. 26-cv-02959-LB

**ORDER GRANTING PLAINTIFF'S MOTION AND DENYING DEFENDANT'S CROSS-MOTION**

Re: ECF No. 9, 10

## INTRODUCTION

The plaintiff applied for Social Security disability-insurance benefits and supplemental security income, claiming (as amended at her administrative hearing) that she has been disabled since June 1, 2022, by congestive heart failure, degenerative joint disease of both knees, obesity, and chronic headaches from a 2012 gunshot wound to the head.[1] An administrative law judge (ALJ) found the impairments severe but concluded that the plaintiff retained the residual functional capacity (RFC) for a reduced range of light work (including standing and walking up to four hours a day) and could perform other jobs in the national economy.[2] The Appeals Council

[1] Administrative Record (AR) – ECF No. 8-1. Citations to the AR are to its internal pagination; all other citations refer to material in the Electronic Case File (ECF) with pinpoint citations to the ECF-generated page numbers at the top of documents. For the claims and the amended onset date: AR 21–23, 27.

[2] AR 21–33 (decision); *see* AR 26 (RFC).

denied review, and the plaintiff asks the court to set aside the Commissioner's final decision under 42 U.S.C. § 405(g).[3]

The case turns on the line between light and sedentary work. Every physician who assessed the plaintiff's physical functioning (consultative examiner Rose Lewis, M.D., and state-agency reviewers B. Morgan, M.D., and Nancy Simpkins, M.D.) limited her to sedentary work or less.[4] The plaintiff was fifty on her amended onset date, has a high-school-equivalent education, and (the vocational expert testified) has no skills that transfer to sedentary work.[5] A sedentary RFC thus would direct a finding of disability under Medical-Vocational Rule 201.14.[6] The ALJ rejected all three opinions, discounted the plaintiff's symptom testimony, and adopted the light RFC. The plaintiff challenges those rulings and contends that the ALJ also erred by ignoring the evidence of her substance-use disorder and by adopting an RFC that no medical evidence supports.[7]

The court reverses and remands for further proceedings. The ALJ's evaluation of the medical opinions does not satisfy 20 C.F.R. § 404.1520c: the ALJ discounted Dr. Lewis's opinion by invoking two normal examination findings while passing over the abnormal findings and the written explanation in the same report, rejected the state-agency opinions as "not well supported by an explanation" immediately after reciting the explanations that supported them, and never considered the three opinions' consistency with one another. Because crediting any one of the opinions would change the outcome, the error was not harmless. Independently, the ALJ's principal reasons for discounting the plaintiff's testimony (medication noncompliance, missed follow-up, and gaps in treatment) are not clear and convincing on this record because the ALJ never considered the documented reasons for the lapses. On remand, the ALJ also must address

[3] AR 1–3; Compl. – ECF No. 1.

[4] AR 30–31 (the ALJ's summary of the opinions); *see also* AR 68–73, 106–08, 516.

[5] AR 32, 45, 56.

[6] 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.14; *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114–15 (9th Cir. 2006).

[7] Pl.'s Br. – ECF No. 9 at 9–23; Reply – ECF No. 11 at 2–5.

the evidence of the plaintiff's substance use. Because material factual issues remain unresolved, the remand is for further proceedings, not an award of benefits.

All parties consented to magistrate-judge jurisdiction.[8] The court decides the case on the parties' briefs without oral argument.[9]

**STATEMENT**

**1. Procedural History**

The plaintiff filed Title II and Title XVI applications on March 25, 2022, alleging disability beginning March 16, 2022.[10] The Commissioner denied the claims initially on March 8, 2023, and on reconsideration on October 24, 2024.[11] At the plaintiff's request, ALJ Melinda Yurich held a telephone hearing on May 7, 2025. The plaintiff, represented by counsel, and a vocational expert testified, and the plaintiff amended her alleged onset date to June 1, 2022.[12] The ALJ issued an unfavorable decision on May 22, 2025, and the Appeals Council denied review on February 5, 2026, making the ALJ's decision the Commissioner's final decision.[13] The plaintiff timely filed this action.[14] Because her date last insured (December 31, 2027) postdates the decision, the period at issue for both claims runs from June 1, 2022 (the amended onset date) through May 22, 2025 (the decision date).[15]

---

[8] Consents – ECF Nos. 6–7; 28 U.S.C. § 636(c).

[9] Civil L.R. 16-5; Pl.'s Br. – ECF No. 9; Comm'r's Br. – ECF No. 10; Reply – ECF No. 11.

[10] AR 21.

[11] *Id.*

[12] *Id.*; *see* AR 39–57 (hearing transcript).

[13] AR 1–3, 21–33.

[14] Compl. – ECF No. 1.

[15] AR 21–23.

United States District Court
Northern District of California

**2. Medical Evidence**

**2.1 Physical Impairments**

In 2012, the plaintiff was shot in the back of the head. A 2021 CT scan showed left occipital encephalomalacia (a loss of brain tissue) with retained metallic fragments, without acute intracranial abnormality.[16] She has diminished hearing in her right ear, a right visual-field defect (right inferior homonymous quadrantanopia) with uncorrected acuity of 20/200 in that eye, and headaches, which she reported had become frequent again by mid-2024.[17]

Her bilateral knee pain dates to at least March 2021, when she reported needing a cane and said that anti-inflammatories, Tylenol, and topical ointments had not helped; providers prescribed Voltaren gel, referred her to physical therapy (the record does not show she attended), and scheduled a steroid injection.[18] In December 2024, providers attributed her continuing knee pain to obesity-related osteoarthritis and restarted acetaminophen, diclofenac gel, and Wegovy.[19] The record contains no knee imaging.[20] She also is obese: her body-mass index was 40 in June 2022, 45.2 in October 2024, and 44.45 in February 2025.[21]

In October 2021, the plaintiff was hospitalized and diagnosed with congestive heart failure; her left-ventricular ejection fraction was mildly reduced at forty-five percent, and she was prescribed Lasix, Entresto, and metoprolol.[22] Her cardiologists identified her stimulant use as the likely cause.[23] The course thereafter was uneven. In January 2022, the heart failure was class II, with shortness of breath only when walking up hills; in June 2022, she reported chest pain, dyspnea on exertion, and a twenty-pound weight gain and was advised to go to the hospital (the record does not show she went); by September 2022, her dyspnea was improving, she had no chest pain, her

---

[16] AR 28–29 (the ALJ's summary of the 2021 records); *see* AR 371.

[17] AR 24, 28–29; *see* AR 362, 370.

[18] AR 28.

[19] AR 29.

[20] AR 26, 30.

[21] AR 30.

[22] AR 29.

[23] AR 469, 473, 494.

United States District Court
Northern District of California

gait was intact, and she had only trace edema.[24] She had no treatment from October 2022 to July 2023.[25] When she reestablished care in August 2023, she was not taking Lasix regularly, used a cane, and had 1+ pitting edema to the knees bilaterally; she was told that weight loss was the way to improve her knee pain, and she was not taking anti-inflammatories or using diclofenac gel.[26] In September 2023, she reported doing well overall except for ongoing knee pain and requested steroid injections.[27] There was no treatment from October 2023 to March 2024.[28] At an April 2024 cardiology consultation, she reported doing overall well, denied chest pain, dizziness, orthopnea, syncope, and shortness of breath, and said her dyspnea on inclines resolved with Lasix, which she was taking only as needed. The plan included a transthoracic echocardiogram that was never obtained.[29] There was no treatment from May to September 2024.[30]

From October to December 2024, the plaintiff reported knee pain and frequent headaches since June or July, missed multiple specialist appointments, and was referred to "complex care management" (a referral her providers based on her comorbidities, including her brain injury, PTSD, ongoing substance use, and reported memory issues) to help with medication compliance and appointment coordination and to keep her from "falling out of care" again.[31] In February 2025, she reported walking less because of knee pain; cardiology documented orthopnea in the preceding weeks, an exercise tolerance of half a block limited by shortness of breath, no edema, and class II-to-III heart failure, and planned to add Jardiance.[32] Treatment notes attribute a genital

---

[24] AR 29.

[25] AR 28.

[26] AR 29.

[27] *Id.*

[28] AR 28.

[29] AR 28–29.

[30] AR 28.

[31] AR 29; *see also* AR 601, 605, 606.

[32] AR 30.

United States District Court
Northern District of California

rash to excessive urination from her prescribed diuretics; the rash delayed alternative weight-loss medication, and she was unable to refill her Wegovy prescription.[33]

### 2.2 Mental Impairments and Substance Use

The plaintiff has diagnoses of posttraumatic stress disorder and depression; her mental-health treatment was minimal.[34] She had a normal mood and affect in September 2022, was tearful and distraught in October 2024, and reported a depressed mood, anhedonia, and negative thinking to behavioral health in November 2024, though she was more hopeful after implementing coping strategies.[35] A December 2024 psychiatric examination showed coherent speech and a normal affect. She endorsed some forgetfulness and later that month reported doing okay from a mental-health perspective.[36]

As for substances, the plaintiff reported smoking crack cocaine three to four times a week in May 2021, told the consultative examiner in December 2022 that her last cocaine use was two months earlier, and told providers in late 2024 that she was still using "every once in a while."[37] Her therapist counseled her extensively about the health consequences of crack use and the interplay between substance use and mood, and assessed her as in the contemplation stage of change with low-to-medium agency in recovery.[38] At the May 2025 hearing, the plaintiff testified that she last used marijuana about a year earlier and last used crack cocaine two or three years earlier.[39]

### 2.3 Medical Opinions

Three physicians assessed the plaintiff's physical functioning. None found her capable of more than sedentary work.

---

[33] AR 528–29, 563, 593–95.

[34] AR 24.

[35] *Id.*

[36] *Id.*

[37] AR 363, 514, 604.

[38] AR 607–08.

[39] AR 48.

Dr. Lewis performed an internal-medicine consultative examination in December 2022, based on a history, a review of San Francisco Department of Public Health records, and her own examination.[40] She observed that the plaintiff was "very obese," walked with an antalgic gait and a cane, and could not perform tandem or toe-heel walking. She found bilateral knee swelling, ankle edema, and limited knee range of motion, and she found the knees non-tender to palpation, with intact motor strength and sensation throughout.[41] Dr. Lewis opined that the plaintiff could stand and walk up to two hours and sit up to four hours in a workday, required a cane for all distances and terrains, could occasionally climb, balance, stoop, kneel, crouch, and crawl, and was limited around unprotected heights, heavy machinery, and temperature extremes.[42] She explained the bases for the limits: ease of fatigability, congestive heart failure, exertional dyspnea, shortness of breath at rest, osteoarthritis of the knees with decreased range of motion, decreased balance, the need for a cane, obesity, and the gunshot-wound sequelae of decreased right-ear hearing and right-eye vision.[43]

Dr. Morgan reviewed the record for the state agency in January 2023, described class III obesity with severe inflammatory arthritis, deemed Dr. Lewis's opinion overly restrictive, and assessed a reduced range of sedentary work: lifting and carrying up to ten pounds, standing and walking two hours, with postural limits, a right-side visual limitation, a cane for all distances and terrains, and avoidance of concentrated cold exposure and even moderate exposure to hazards.[44] On reconsideration in April 2024, Dr. Simpkins reviewed the updated record (including April 2024 treatment notes recording that the plaintiff was "doing well overall" with mild edema) and concurred in a reduced range of sedentary work with similar postural, visual, and environmental limits.[45]

---

[40] AR 30.

[41] *Id.*; AR 513–15.

[42] AR 30; AR 516.

[43] AR 516. The Commissioner does not dispute the report's contents. Comm'r's Br. – ECF No. 10 at 5.

[44] AR 30–31; AR 68–73.

[45] AR 31; AR 104–08.

**3. The Administrative Hearing**

The plaintiff testified that she is five feet six inches tall and weighs 279 pounds, lives with her four sons (ages fifteen to twenty-one), has a GED, and does not have a driver's license.[46] She last worked in June 2022 as an in-home caregiver for her mother and stopped when she was not feeling well and learned she had heart failure.[47] She cannot work, she said, because of difficulty breathing and arthritis in both knees: she can stand no longer than about five minutes before her legs swell; the only treatment for her knees is a prescription cream; she can walk about half a block, then must stop and rest about five minutes; she sometimes uses a cane (her mother's), and her son helps her; and she can carry only a light bag of groceries.[48] On a typical day she stays home in bed watching television or sleeping; she occasionally goes to the store next door, cooks sitting in a chair, and takes the bus (the stop is about a block away) to the doctor.[49] Warm baths help her knees; she has "really bad headaches"; her body hurts a lot; her back goes out if she stands a long time; and she can clean about twenty minutes before resting ten to twenty.[50]

The vocational expert classified the past work as home attendant (DOT 354.377-014), semiskilled (SVP 3) and medium as generally performed.[51] For a hypothetical person with the limitations the ALJ later adopted (posed across the second and third hypotheticals), the expert testified that the person could not perform the past work but could work as a fundraiser II (38,800 national jobs), a survey worker (13,200), and an investigator, dealer accounts (8,800).[52] In response to counsel, the expert testified that no skills transfer from the past work to sedentary jobs.[53] Counsel argued that the plaintiff would "grid out" at step five with a sedentary RFC: the amended onset date postdated her fiftieth birthday, the consultative examiner had placed her below

[46] AR 45.

[47] AR 45–46.

[48] AR 47–48.

[49] AR 49–50.

[50] AR 50–51.

[51] AR 52.

[52] AR 53–54.

[53] AR 56.

sedentary, and the state agency had placed her at sedentary at both the initial and reconsideration levels.[54]

#### 4. The ALJ's Decision

The ALJ followed the five-step sequential evaluation. At step one, the plaintiff had not engaged in substantial gainful activity since June 1, 2022.[55] At step two, she had severe degenerative joint disease of the knees, obesity, congestive heart failure, and headaches status post gunshot wound to the head; her other physical conditions and her PTSD and depression were nonsevere, with "mild" limitation in each of the four "paragraph B" areas of mental functioning.[56] At step three, no listing was met or medically equaled.[57] The ALJ assessed an RFC for light work, except standing and walking up to four hours and sitting up to six hours a day; no ladders, ropes, or scaffolds; occasional ramps, stairs, and other postural activities; no concentrated exposure to hazards or extreme cold; and no more than moderate noise.[58] At step four, the plaintiff could not perform her past relevant work; at step five, based on the vocational expert's testimony, she could perform the three light jobs, so she was not disabled.[59]

On symptoms, the ALJ found that the plaintiff's impairments could reasonably be expected to cause the alleged symptoms but that her statements about their intensity, persistence, and limiting effects were "not entirely consistent" with the record because (1) the treatment record demonstrated improvement, (2) she was not entirely compliant with prescribed medications, (3) she failed to follow up on recommendations (the physical-therapy referral, the June 2022 advice to

---

[54] *Id.*

[55] AR 23.

[56] AR 23–25.

[57] AR 25–26.

[58] AR 26.

[59] AR 31–33.

go to the hospital, the planned echocardiogram, and missed specialist appointments), (4) there were significant gaps in treatment, and (5) no treating doctor placed restrictions on her.[60]

The ALJ found all three medical opinions unpersuasive. Dr. Lewis's opinion was "inconsistent with the treatment record that showed improvement, the mild nature of her CHF, her failure to follow up with treatment recommendations, the lack of any diagnostic studies of the knees, her medication noncompliance, her often normal gait and the significant gaps in treatment," and "not well supported by an explanation or the evaluator's own examination that revealed intact motor strength and sensation throughout as well as the lack of tenderness to palpitation of the knees."[61] The ALJ rejected Dr. Morgan's and Dr. Simpkins's assessments with the identical consistency rationale. As to each, she recited the bases for the assessment (for Dr. Morgan, "the treatment record that showed class II CHF, the extent of her obesity, her antalgic gait, the bilateral knee and ankle swelling, the decreased range of motion in the knees as well as the extent of her shortness of breath and fatigue"; for Dr. Simpkins, the same plus the plaintiff's "acknowledgment that she was doing well albeit with ongoing knee pain") and then stated that each opinion was "not well supported by an explanation."[62] The decision does not mention the plaintiff's substance use.[63]

## LEGAL STANDARDS

### 1. Standard of Review

Under 42 U.S.C. § 405(g), the court may set aside the Commissioner's denial of benefits only if the ALJ's findings are based on legal error or are not supported by substantial evidence.[64] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion": more than a mere scintilla, but less than a preponderance.[65] The

[60] AR 26–30.

[61] AR 30.

[62] AR 30–31.

[63] AR 21–33.

[64] 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019).

[65] *Biestek*, 587 U.S. at 103, 105 (cleaned up).

court reviews the record as a whole, weighing the evidence that supports and the evidence that detracts from the ALJ's conclusions, and must uphold the decision where the evidence is susceptible to more than one rational interpretation.[66] But the court reviews only the reasons the ALJ gave and may not affirm on a ground the agency did not invoke.[67] An error is harmless only if it is inconsequential to the ultimate nondisability determination.[68]

**2. The Five-Step Sequential Evaluation**

A claimant is disabled if a medically determinable impairment of the requisite duration prevents her from engaging in any substantial gainful activity.[69] The Commissioner evaluates disability in five sequential steps: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether, given her RFC, she can perform her past relevant work; and (5) whether she can perform other work that exists in significant numbers in the national economy.[70] The claimant has the burden at steps one through four; at step five, the burden shifts to the Commissioner. Where a claimant's exertional capacity, age, education, and work experience match a rule in the Medical-Vocational Guidelines, the rule directs a conclusion of "disabled" or "not disabled."[71]

## ANALYSIS

**1. The ALJ Erred in Evaluating the Medical Opinions**

For applications filed, like the plaintiff's, after March 27, 2017, the ALJ does not defer or give specific evidentiary weight to any medical opinion. She instead evaluates each opinion's

---

[66] *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993); *Smartt v. Kijakazi*, 53 F.4th 489, 494 (9th Cir. 2022).

[67] *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225–26 (9th Cir. 2009).

[68] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).

[69] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[70] 20 C.F.R. § 404.1520(a)(4). The Titles II and XVI regulations are materially identical; like the parties, the court cites the Title II regulations. The parallel Title XVI provisions are at 20 C.F.R. §§ 416.900–416.999.

[71] 20 C.F.R. pt. 404, subpt. P, app. 2; *Lounsburry*, 468 F.3d at 1114–15.

persuasiveness, and the two most important factors are supportability (the extent to which the source supports the opinion with objective medical evidence and explanations) and consistency ("the extent to which a medical opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim").[72] The ALJ must articulate how she considered both factors, and she "cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."[73] The ALJ's explanations here do not meet that standard.

**1.1 Dr. Lewis**

The ALJ gave one supportability reason and one consistency reason for rejecting Dr. Lewis's opinion. Neither is an explanation supported by substantial evidence.

The supportability reason was that the opinion was "not well supported by an explanation or the evaluator's own examination," which showed intact motor strength and sensation and knees that were not tender to palpation.[74] But Dr. Lewis did explain her opinion. She enumerated its bases: fatigability, heart failure, exertional dyspnea, shortness of breath at rest, knee osteoarthritis with decreased range of motion, decreased balance, the need for a cane, obesity, and the gunshot-wound sequelae.[75] And her examination contained findings that support the limits (a "very obese" habitus, an antalgic gait with a cane, an inability to perform tandem or toe-heel walking, bilateral knee swelling and ankle edema, and limited knee range of motion), findings the ALJ herself recited two paragraphs earlier.[76] The two normal findings the ALJ selected do not engage the opinion's stated bases: strength and sensation testing does not measure the cardiopulmonary endurance (the fatigability, dyspnea, and shortness of breath) at the core of the assessment, and non-tender knees say little about weight-bearing tolerance when swelling and reduced range of motion were documented at the same visit. An ALJ may resolve conflicts within an examining

[72] 20 C.F.R. § 404.1520c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 791–92 (9th Cir. 2022) (cleaned up).

[73] *Woods*, 32 F.4th at 792; 20 C.F.R. § 404.1520c(b)(2).

[74] AR 30.

[75] AR 516.

[76] AR 30; AR 513–15.

source's report, but she must engage with the whole report; isolating the normal findings while disregarding the abnormal ones is the selective review the case law forbids.[77]

The consistency reason fares no better. Parts of it are contradicted by the record the ALJ cited. The "often normal gait", for example, was mixed: intact in September 2022, antalgic with a cane at the December 2022 examination, and cane-assisted in August 2023.[78] The "improvement" concerned the heart failure, and even there the final cardiology note documented class II-to-III failure, recent orthopnea, and a half-block exercise tolerance.[79] The remaining items (the follow-up failures, the medication noncompliance, and the treatment gaps) rest on adverse inferences that the ALJ drew without considering the documented reasons for the lapses, a defect addressed in Part 2 below. And the analysis omits the most probative consistency evidence of all: the regulation defines consistency by reference to "the evidence from other medical sources," and two reviewing physicians independently assessed materially identical limits.[80] An ALJ need not discuss every piece of evidence, but she cannot measure an opinion's consistency with the record while omitting the other medical opinions that corroborate it.[81]

**1.2 Drs. Morgan and Simpkins**

The articulation here fails on its own terms. For each consultant, the ALJ accurately recited the stated bases for the assessment (the treatment record showing class II heart failure, the extent of the obesity, the antalgic gait, the bilateral knee and ankle swelling, the decreased knee range of motion, and the extent of the shortness of breath and fatigue) and then concluded, without more, that the opinion was "not well supported by an explanation."[82] Perhaps the ALJ meant that the

---

[77] *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001); *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999) (a decision "cannot be affirmed simply by isolating a specific quantum of supporting evidence") (cleaned up).

[78] AR 29–30.

[79] AR 30.

[80] 20 C.F.R. § 404.1520c(c)(2).

[81] *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1193 (9th Cir. 2022) (an ALJ "must explain why significant probative evidence has been rejected") (cleaned up); *Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984).

[82] AR 30–31.

explanations were inadequate rather than absent. But she never said what was missing or why objective findings of that kind do not support a two-hour standing-and-walking limit. A conclusion that contradicts the ALJ's own preceding sentence, without elaboration, does not permit meaningful review and is not supported by substantial evidence.[83]

The consistency rationale is word-for-word the rationale given for Dr. Lewis and fails for the same reasons. As to Dr. Simpkins, the improvement theory is weaker still: she reviewed the updated 2024 records (including the April 2024 "doing overall well" visit that the ALJ emphasized) and adhered to the sedentary assessment.[84] The later treatment evidence thus did not undercut the opinions in the way the ALJ's reasoning assumed.

The Commissioner's defenses do not cure these problems. He argues that the ALJ's path is reasonably discernible despite the absence of pinpoint citations and that the record was short.[85] The difficulty is not citation format. It is that the path the ALJ marked runs through mischaracterizations (the opinions were "not well supported by an explanation"; the gait was "often normal") and omissions (Dr. Lewis's abnormal findings and written explanation and the opinions' mutual consistency). A discernible path must also be a supportable one, and the court can affirm only on the grounds the agency invoked.[86] The Commissioner also defends the supportability findings on the ground that the evidence the consultants cited "fails to support" less-than-sedentary limits, a rationale the ALJ did not give.[87] And the rule that the court must uphold a rational interpretation of the evidence presupposes findings grounded in the record. It does not insulate findings that the cited record contradicts.[88]

---

[83] *Woods*, 32 F.4th at 792; *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014).

[84] AR 31; AR 104–05.

[85] Comm'r's Br. – ECF No. 10 at 5–6 (citing *Molina*, 674 F.3d at 1121).

[86] *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015); *Bray*, 554 F.3d at 1225–26.

[87] Comm'r's Br. – ECF No. 10 at 6.

[88] *Smartt*, 53 F.4th at 494.

United States District Court
Northern District of California

### 1.3 The Error Was Not Harmless

The opinion evidence was unanimous at sedentary or less. Credited, it would direct a finding of disability under Rule 201.14: the plaintiff was fifty at her amended onset date (and fifty-three at the decision), has a high-school-equivalent education, and has semiskilled past work with (per the uncontradicted vocational-expert testimony) no transferable skills.[89] Dr. Lewis's opinion would go further: a four-hour sitting capacity, combined with two hours of standing and walking, is incompatible with sustained full-time work at any exertional level.[90] The errors in evaluating the opinions therefore go to the dispositive issue and were not harmless.[91] Remand is required.

## 2. The ALJ Did Not Give Clear and Convincing Reasons for Discounting the Plaintiff's Symptom Testimony

Where, as here, a claimant produces objective medical evidence of impairments that could reasonably be expected to produce the alleged symptoms, and there is no evidence of malingering, the ALJ may discount the claimant's testimony about symptom severity only by giving "specific, clear and convincing reasons," meaning reasons that identify the testimony found not credible and the evidence that undermines it.[92]

The ALJ's central reasons (the medication noncompliance, the failures to follow up, and the treatment gaps) are permissible considerations in principle.[93] But the agency's own guidance forbids an adverse inference "without considering possible reasons he or she may not comply with

---

[89] AR 32, 45, 56; 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.14; *Lounsburry*, 468 F.3d at 1114–15. The state-agency denials rested on the then-open transferability question, which the vocational expert's testimony later closed. AR 56; *see also* AR 62, 109.

[90] AR 516; SSR 96-8p (an RFC is an assessment of the ability to work "8 hours a day, for 5 days a week, or an equivalent work schedule").

[91] *Molina*, 674 F.3d at 1115.

[92] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (cleaned up); *Brown-Hunter*, 806 F.3d at 493–94; AR 27 (step-one finding; no malingering finding). The Commissioner preserves an objection to the clear-and-convincing standard. Comm'r's Br. – ECF No. 10 at 1 n.2. The standard remains the law of this circuit. *Smartt*, 53 F.4th at 497.

[93] 20 C.F.R. § 404.1529(c)(3); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

treatment or seek treatment consistent with the degree of his or her complaints."[94] The record supplied reasons the ALJ never mentioned. The plaintiff's Lasix use was complicated by a documented side effect: excessive urination that providers linked to a genital rash.[95] She reported repeatedly that anti-inflammatories and topicals did not relieve her knee pain, which bears on the significance of her not taking them.[96] And her own providers treated the missed appointments and lapses in care as a clinical problem to be managed, not a sign of exaggeration: they referred her to complex-care management (citing her brain injury, PTSD, ongoing substance use, and memory complaints) to keep her from "falling out of care" again.[97] Where mental impairments or their sequelae plausibly explain treatment lapses, the lapses are not clear and convincing evidence that symptoms are overstated unless the ALJ grapples with the explanation.[98] The ALJ remains free on remand to weigh those explanations and, with adequate reasons, to reject them; what she could not do was rely on the conduct while ignoring them.

The remaining reasons cannot carry the finding alone. The improvement the ALJ identified was cardiac; she identified no comparable improvement in the knees, the headaches, or the obesity (the subjects of most of the testimony), and improvement must be read in the context of the overall diagnostic picture.[99] Even as to the heart failure, the ALJ's own summary ends in February 2025 with class II-to-III failure, recent orthopnea, and a half-block walking tolerance, findings that corroborate, rather than contradict, the plaintiff's testimony that she can walk half a block before resting.[100] And the absence of treating-source work restrictions has little probative value here: the

---

[94] SSR 16-3p; *accord Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).

[95] AR 528–29, 563, 595; SSR 16-3p (a claimant "may not agree to take prescription medications because the side effects are less tolerable than the symptoms").

[96] AR 28 (in March 2021 she "denied improvement with anti-inflammatories, Tylenol or topical ointments"); *see also* AR 362.

[97] AR 601, 605, 606.

[98] *Garrison v. Colvin*, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) ("we do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying" impairments) (cleaned up).

[99] *Holohan*, 246 F.3d at 1205; *Brown-Hunter*, 806 F.3d at 493–94 (the ALJ must identify the testimony found not credible and the evidence that undermines it).

[100] AR 30, 47.

plaintiff stopped working in June 2022 and was in no return-to-work posture that would prompt a physician to record restrictions, and (unlike in the cases the Commissioner cites), the physicians who did assess her functioning found limits that would compel a disability finding under the Grids.[101]

The reasons, singly and together, fall short of the clear-and-convincing standard. On remand, the ALJ must reassess the symptom testimony under 20 C.F.R. § 404.1529 and SSR 16-3p.

**3. On Remand, the ALJ Must Address the Substance-Use Evidence**

The decision nowhere mentions the plaintiff's substance use, even though the evidence of it was significant and probative: her cardiologists identified her stimulant use as the likely cause of the heart failure at the center of the case, therapy notes documented ongoing (if diminishing) use into late 2024 and counseling directed at it, and the complex-care referral listed it among her comorbidities.[102] An ALJ need not discuss every piece of evidence, but she must explain why she has rejected evidence that is significant and probative.[103]

The Commissioner responds that the evidence of use was minimal and that the plaintiff identifies no limitation the RFC omitted.[104] Those points have some force as far as they go: step two was resolved in the plaintiff's favor, and the omission of a substance-use impairment from the step-two list, standing alone, likely would be harmless.[105] But the omission was not confined to step two. It bears on the "paragraph B" ratings, which rested on the plaintiff's hearing performance and largely normal mental-status findings without weighing the combined evidence of PTSD, brain injury, and stimulant use.[106] And, as explained in Part 2, it bears directly on the

[101] *Cf. Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (no examining doctor had opined that the claimant was disabled); *Eskew v. Astrue*, 462 F. App'x 613, 616 (7th Cir. 2011) (the absence of work restrictions did not "illuminate the question of her credibility — she was after all unemployed").

[102] AR 469, 473, 494, 601, 604–08.

[103] *Kilpatrick*, 35 F.4th at 1193; *Vincent*, 739 F.2d at 1394–95.

[104] Comm'r's Br. – ECF No. 10 at 6–7.

[105] *Cf. Molina*, 674 F.3d at 1115.

[106] AR 24–25; 20 C.F.R. § 404.1520a(c)(1) (the assessment requires "all relevant evidence to obtain a longitudinal picture" of mental functioning).

United States District Court
Northern District of California

ALJ's treatment of the noncompliance and the missed care. The Commissioner's minimal-evidence characterization is, moreover, a rationale the ALJ never gave, and it sits uneasily with the record: the notes reflect use two months before the December 2022 consultative examination and "every once in a while" in late 2024, which conflicts with the plaintiff's hearing testimony that her last use was two or three years before May 2025.[107] That conflict is for the ALJ to resolve in the first instance.

On remand, the ALJ must determine whether the substance use is a medically determinable impairment (clinical findings reported by an acceptable medical source may establish one even without laboratory findings) and must consider it, together with the PTSD and the brain injury, at steps two and three and in formulating the RFC.[108] If, and only if, the ALJ finds the plaintiff disabled considering all of her impairments including the substance use, the ALJ must then determine whether the substance use is a contributing factor material to the determination of disability.[109] The court does not decide whether this issue alone would warrant remand.

**4. The Remedy Is a Remand for Further Proceedings**

The plaintiff's remaining contention (that the RFC was legally deficient and rested on the ALJ's lay interpretation of raw medical data) is derivative. Because the ALJ must reevaluate the opinions and the symptom testimony, she must also revisit the RFC (including the four-hour standing-and-walking capacity, a figure no medical source endorsed) and, as necessary, the findings at steps four and five. The court therefore does not reach the categorical argument that an RFC unsupported by any medical opinion necessarily lacks substantial evidence.[110]

As for the remedy, the ordinary course when the agency errs is a remand for further proceedings. A remand for an award of benefits is reserved for rare circumstances: the record must

---

[107] AR 48; *see* AR 514, 604.

[108] SSR 13-2p; 20 C.F.R. §§ 404.1520a, 404.1521.

[109] 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); SSR 13-2p.

[110] Pl.'s Br. – ECF No. 9 at 15, 22–23; Reply – ECF No. 11 at 2–3; *cf.* Comm'r's Br. – ECF No. 10 at 7 (citing *Osenbrock v. Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001)).

be fully developed, further proceedings must serve no useful purpose, and the improperly discredited evidence, credited as true, must require a finding of disability, and even then, not if the record as a whole creates serious doubt that the claimant is in fact disabled.[111] The plaintiff's opening brief asked only for further proceedings; the request for an immediate award appears for the first time in her reply.[112] The court need not consider it, and it fails in any event: material factual issues remain: the reasons for and significance of the treatment lapses, the extent of the cardiac improvement, the persuasiveness of the opinions once they are properly evaluated, and the substance-use questions, including materiality if the ALJ finds disability. Those open issues leave serious doubt on the current record, and further proceedings would be useful. The remand is for further proceedings.

## CONCLUSION

The court reverses the Commissioner's final decision and remands the case for further administrative proceedings under sentence four of 42 U.S.C. § 405(g). On remand, the ALJ must (1) reevaluate the opinions of Drs. Lewis, Morgan, and Simpkins under 20 C.F.R. §§ 404.1520c and 416.920c, articulating supportability and consistency findings that are supported by substantial evidence, including the opinions' consistency with one another, (2) reassess the plaintiff's symptom testimony under 20 C.F.R. §§ 404.1529 and 416.929 and SSR 16-3p, including any reasons for her treatment lapses, (3) address the evidence of the plaintiff's substance use consistent with SSR 13-2p, and (4) reassess the RFC and, as necessary, the findings at steps four and five, obtaining supplemental vocational-expert evidence as warranted.

This resolves ECF Nos. 9 and 10.

**IT IS SO ORDERED.**

Dated: September 16, 2026

LAUREL BEELER
United States Magistrate Judge

[111] *Treichler*, 775 F.3d at 1099–1102; *Garrison*, 759 F.3d at 1020–21.

[112] Pl.'s Br. – ECF No. 9 at 23; Reply – ECF No. 11 at 5.